**John DOE, Plaintiff–Appellant,**

v.

**John DOE, et al., Defendants–Appellees.**

Nos. 90–3226, 90–3536.

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1991.

Rhonda M. Benedetto, Lanny R. Zatzkis, New Orleans, La., for plaintiff-appellant.

Francis A. Olivier, III, John L. Olivier, Sunset, La., for Davis and defendants-appellees.

Malcolm W. Monroe, Joseph L. Spilman, III, Deutsch, Kerrigan & Stiles, New Orleans, La., for Nill.

Before WISDOM, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Dr. Lucas A. DiLeo is a physician who lives in New Orleans, Louisiana. In 1989, he filed two defamation lawsuits against the respective authors and publishers of two best-selling books, *Contract on America: The Mafia Murder of President John F. Kennedy* and *Mafia Kingfish: Carlos Marcello and the Assassination of John F. Kennedy*. Both books make passing mention of a Dr. Lucas A. DiLeo of New Orleans and arguably accuse him of play-

ing a part in the assassination of Dr. Martin Luther King, Jr. The District Court for the Eastern District of Louisiana entered summary judgment against DiLeo in each suit, largely if not entirely on one ground: that Louisiana's privilege of fair reporting insulated the defendants from liability. DiLeo now appeals, arguing in the main that the trial court erred in its construction and application of this privilege. Not blind to the obvious similarities in the two cases, we consolidated them for oral argument; now, on account of the reasons that follow, we reverse and remand.

I

In September 1976, the 94th Congress established the House Select Committee on Assassinations and charged it with the task of conducting "a full and complete investigation of the circumstances surrounding the deaths of President John F. Kennedy and Dr. Martin Luther King, Jr." Its task accomplished, the Committee in March 1979 published a prolix report (hereinafter the "Report") comprising its final "Findings and Recommendations." One segment of that Report—Part II, subchapter C3, section (a)—dealt with allegations made by William Sartor, a New Orleans-based journalist whose credits included articles published in *Time* magazine. As the Report itself reveals, the gist of Sartor's allegations was that New Orleans underworld figures had a hand in King's untimely death:

> Writer William Sartor, in an unpublished manuscript, advanced the possibility, among other allegations, that organized crime participated in Dr. King's assassination. The committee focused its attention on Sartor's contention that, in New Orleans in December 1967, James Earl Ray met with Charles Stein and three persons who were connected with organized crime and white supremacist groups. The meeting allegedly was held at either the Town & Country Motel, owned by New Orleans Mafia boss Carlos Marcello, or the Provincial Motel, where Ray stayed from December 17 to 19, 1967.

Sartor, who died in 1971, had provided no information about how he discovered that such a meeting occurred, and he wrote that he was not aware of the subject of the meeting. In support of his speculation that this meeting was in some way linked to the assassination of Dr. King, however, Sartor pointed to the following considerations:

> The proximity in time between the meeting and the assassination;

> The occurrence of the meeting in a city Sartor described as a bastion of racist thinking;

> The location of the meeting at either one of two hotels that Sartor suggested were guest houses for an underworld clientele; and

> Ray's statement to author William Bradford Huie that he left New Orleans with $2,500 cash and the promise of $12,000 more for doing one last big job in 2 to 3 months.

Sartor wrote that Sam DiPianzza, Sol La Charta and Lucas Dilles were also in the meeting. DiPianzza and La Charta were described by Sartor as involved in organized crime, as well as avid racists. Dilles, also a racist, was allegedly connected with the late Leander Perez, Louisiana political boss and virulent segregationist.

Further investigation by the committee revealed that the correct spelling for names of the persons alluded to by Sartor was Salvadore "Sam" DiPiazza, Dr. Lucas A. DiLeo, and Salvadore La Charda.

Sartor also speculated that Ray may have been told during this meeting that Carlos Marcello would protect him after the assassination because Sartor believed both DiPiazza and La Charda had direct ties to Marcello.

The committee checked the backgrounds of the three persons named by Sartor. DiPiazza, a suburban New Orleans resident, was a gambler and bookmaker with reputed connections to Marcello and other underworld figures. Approximately 3 weeks before the alleged meeting, DiPiazza was sentenced to 10

years in prison on a gambling conviction. Although he was free on bond at the time of the alleged meeting, he denied in a committee interview ever meeting with Ray. DiLeo, a practicing physician in a New Orleans suburb, had a record for such minor offenses as disturbing the peace, resisting arrest, and assault. When questioned by the committee, he maintained that he never had heard of the Provincial Motel but admitted he was familiar with the Town & Country Motel where he had stayed once 20 years earlier. He stated that he had never met or spoken with Ray or Marcello. Salvadore La Charda, formerly Chief Juvenile Probation Officer in the St. Bernard Parish Sheriff's Office, committed suicide in June 1968. He had no criminal record. DiLeo and DiPiazza were unable to account for their whereabouts on December 17 through 19, 1968.

A review of the Provincial Motel records indicated that the persons named by Sartor had not registered at the motel while Ray was there. Town & Country records were no longer available. Both Charles Stein and Carlos Marcello told the committee they knew of no such meeting with Ray or the others.

In this manuscript, Sartor named two sources of his information. Carlton Pecot, the first Black police officer in New Orleans and the director of a Federal education program aiding minority students in 1978, appeared to be the primary source of Sartor's New Orleans information. When questioned under oath by the committee with regard to Sartor's reliability and the accuracy of his notes, Pecot claimed, however, that he was unfamiliar with most of the facts and statements in Sartor's manuscript. Pecot did recall meeting with Sartor five to eight times to assist with his investigation of relevant leads in the King case.

Robert Lyons, another purported Sartor source, told the FBI in 1968 that Sartor had attributed false information to him that in reality originated with Sartor.

The committee found no support for Sartor's contention that Ray met with persons involved in organized crime in New Orleans before the assassination.[1]

Endnotes to this segment of the Report reference a "Manuscript of William Sartor (MLK document 110334)" as well as an "Interview of Dr. Lucas A. DiLeo, Feb. 22, 1978, House Select Committee on Assassinations (MLK document 260205)." Unlike the Report, however, which is freely available, the "Manuscript" and the "Interview" (along with all other background documents) have been sealed by congressional order until the year 2029.

For some, the Report fulfilled its mandate to be "full and complete"; for others, it raised as many questions as it answered. A member of the latter camp, David E. Scheim, wrote and in 1983 had published *Contract on America*, described by its jacket as "an explosive, authoritative expose of organized crime's brazen assault on the American political process." More specifically, *Contract on America* touts itself as presenting "hard evidence confirming long-suspected Mob culpability" in the assassinations of Kennedy and King. The only edition of this self-described expose relevant here was published in 1988 by Shapolsky Publishers and republished, in paperback, by Kensington Publishing the following year.

In that edition, Scheim drew upon the Report to surmise that there was more to King's assassination than meets the undiscerning eye:

> The trail of the King case did in fact lead into Marcello's turf. On December 15, 1967, less than four months before the Memphis shooting, Ray and another man, Charles Stein, took a car trip from California to New Orleans—the same city frequented by Oswald, Ruby, Ferrie and Brading in the months before the Kennedy assassination. According to the House Assassinations Committee, Ray took the "possibly sinister" trip with a specific and important objective, accomplished it rapidly, met with someone in New Orleans and received money on the

---

1. *H.R.Rep. No. 1828,* 95th Cong., 2d Sess., pt. 2, pp. 387–388 (internal citations omitted).

trip. Ray himself admitted receiving $500 during this trip but provided a dubious account of how he obtained it. His brother John explained the apparent limit to Ray's candor:

> If my brother did kill King he did it for a lot of money—he never did anything if it wasn't for money—and those who paid him wouldn't want him sitting in a courtroom telling everything he knows.

The underworld involvement of Ray's traveling companion, Charles Stein, provides a possible clue to Ray's contact in New Orleans. A 38–year–old former resident of that city, Stein had touched key bases there during his criminal career. In the mid–1950s, he worked at several bars in the French Quarter, including Marie's Lounge, where he managed and ran dice tables. In the early 1960s, he ran a prostitution ring that included his wife. During the same period, he was also reputedly involved in selling narcotics—a favorite Mafia activity in New Orleans, along with gambling and prostitution. Later, in 1974, Stein was convicted of selling heroin in California.

When Stein and Ray arrived in New Orleans on December 17, 1967, they drove to the Provincial Motel, where Ray checked in on Stein's recommendation. According to William Sartor, an independent researcher, both Stein and Ray subsequently met with three men: Salvatore "Sam" DiPiazza, Dr. Lucas A. DiLeo and Salvadore La Charda. Sartor alleged that DiPiazza and La Charda had direct ties to Carlos Marcello and that all three were avid racists. The site of the meeting was either the Provincial Motel, where Ray was staying, or Marcello's Town and Country Motel; both were reputed underworld hangouts.

When questioned by the House Assassinations Committee, Carlos Marcello, DiPiazza, DiLeo, Stein and two of Sartor's reported sources denied his allegations; La Charda could not be interviewed since he had "committed suicide in June 1968." Yet the Committee did confirm that DiPiazza was a bookmaker with reputed Marcello connections. It also found that DiLeo, a practicing physician, "had a record for such minor offenses as disturbing the peace, resisting arrest, and assault." And the Committee could establish nothing about the whereabouts of DiPiazza, DiLeo or La Charda during mid-December 1967 to preclude the alleged meeting with Ray and Stein.[2]

About one year after Shapolsky's release of *Contract on America*, McGraw–Hill published *Mafia Kingfish*, written by John H. Davis. Like Scheim's tract, *Mafia Kingfish* pried into the circumstances surrounding the Kennedy and King killings and, more particularly, alluded to the Report, the manuscript of the "respected New Orleans-based journalist" William Sartor, and one Dr. Lucas A. DiLeo:

> In his manuscript Sartor concluded that there was a high probability that organized crime had played a role in Dr. King's assassination, basing his conclusion primarily on a report he had received from a reliable source of a meeting James Earl Ray had in New Orleans around December 17, 1967, with a New Orleans friend, Charles Stein, and certain associates of Carlos Marcello's. The meeting, Sartor claimed, was held in either Marcello's Town & Country Motel or the Provincial Motel, another mob hangout, where motel records established that Ray had stayed from December 17 to 19.

> Sartor claimed that the associates of Carlos Marcello's with whom Ray and Stein met were Salvadore "Sam" DiPiazza, Dr. Lucas A. DiLeo, and Salvadore LaCharda. Since Sartor had been informed that DiPiazza and La Charda had direct ties to Carlos Marcello, he speculated that Ray was told at the meeting that Carlos Marcello had agreed to protect him after the assassination.

2. David E. Scheim, *Contract on America: The Mafia Murder of President John F. Kennedy* (1988) (internal citations omitted). In an endnote, Scheim indicates that he has spelled DiPiazza, DiLeo, and La Charda's names "as determined correct by the House Assassinations Committee."

To back up his contention, William Sartor cited in his manuscript what James Earl Ray had told author William Bradford Huie in an interview for Huie's book on Ray, *He Slew the Dreamer;* Ray had left New Orleans on December 19, approximately three months before Dr. King was assassinated, with $2500 in cash, paid to him by someone whose name he would not divulge, and a promise of $12,000 more for doing "one last big job in two or three months."

Needless to say, when Sartor's manuscript was belatedly brought to the attention of J. Edgar Hoover, who had concluded within days of the assassination that James Earl Ray had murdered Dr. King, acting alone, the FBI director dismissed it out of hand and decided not to conduct an investigation of its allegations.

But in 1978 the House Select Committee on Assassinations decided that both McFerren's and Sartor's allegations deserved investigation and found that James Earl Ray had indeed stayed at the Provincial Motel in New Orleans from December 17 to 19, 1967, and that the Provincial Motel had the reputation of catering to an underworld clientele. It further established that Sam DiPiazza was a major gambler and bookmaker associated with Carlos Marcello; that Lucas DiLeo was a practicing physician in a New Orleans suburb with a police record for disturbing the peace, resisting arrest, and assault; and that Salvadore La Charda, a former probation officer in the St. Bernard's Parish Sheriff's Office, had committed suicide three months after the King assassination. Furthermore, the committee's investigation of the McFerren allegation established that Frank Liberto's New Orleans brother, Salvatore, was indeed connected to the Marcello organization.

Both DiPiazza and DiLeo subsequently testified before the Assassinations Committee that they had never met James Earl Ray. And Carlos Marcello and Charles Stein testified before the committee, under grant of immunity, that they knew of no such meeting as that described by Sartor in his manuscript. Salvatore Liberto was not interviewed by the committee. Upon running into this stone wall of denials, the Assassinations Committee concluded that there was no support for Sartor's contention that James Earl Ray met with persons associated with organized crime in New Orleans prior to the assassination of Dr. King.

The committee did, however, discover a disconcerting FBI intelligence report of October 1961: A prominent member of the Ku Klux Klan, William Hugh Morris of New Orleans, told a Klan meeting in October 1961, in his capacity as imperial wizard and emperor of the Federated Knights of the Klan, that southern racial problems could be eliminated only by the murder of Dr. King and that he had a New Orleans underworld associate "who would kill anyone for a price." However, the committee decided not to place much importance on the report after Morris, in an appearance before the committee, denied making these statements. And that was that. The matter of Marcello involvement in the King assassination was closed.

The results of my limited investigation of the McFerren and Sartor allegations suggested that perhaps the Assassinations Committee should have probed a little deeper. For I found out that Frank Liberto's New Orleans brother, Salvatore, who, according to John McFerren's allegations, was supposed to pay the assassin of Martin Luther King, Jr., $5000, was a member of a New Orleans family of Sicilian origin, heavily involved in the city's Mafia-dominated produce markets that did a good deal of business with French market associates of Carlos Marcello's. I also concluded that the Sam DiPiazza with whom, according to Sartor, Ray met was the same Sam DiPiazza of the Marcello gambling organization who had been indicted in Texas for illegal gambling in Houston and New Orleans involving millions of dollars in layoff bets; this was at the time District Attorney Jim Garrison was claiming

there was no such thing as organized crime in New Orleans Parish. A convicted felon, free on bail when he allegedly met with Ray, DiPiazza was known at the time to be a much-favored associate of Carlos Marcello's because of the large amounts of cash he generated for the boss's organization.

Given the established facts that James Earl Ray had stayed at the Provincial Motel in New Orleans from December 17 to 19, 1967, a bare three months before Dr. King was assassinated, that the Provincial Motel was a known mob hangout, that Ray was hurting for money at the time and later told William Bradford Huie that he had been paid $2500 while he was in New Orleans, with a promise of another $12,000 when, during the next two or three months, he got "one more big job done," and that Carlos Marcello had a known contempt for blacks and Martin Luther King, Jr., and sympathy for the Ku Klux Klan, it does not appear to be beyond the realm of possibility that Carlos Marcello might have ordered certain subordinates, perhaps Liberto, perhaps DiPiazza, to pay James Earl Ray a few thousand dollars to keep him going, as he stalked Dr. King from one city to another, and promised him protection and more money after he did what he had to do to the hated King.[3]

DiLeo did not take kindly to this unsolicited publicity. On March 6, 1989, his now-former attorney fired off a letter to Scheim, alleging that the statements "about" DiLeo in *Contract on America* were "gross falsehood[s]" and charging, somewhat inconsistently, that Scheim had "the wrong Dr. DiLeo." The letter closed by demanding a retraction, an apology, and "a termination of any reference to him in any further printings of [the] book." Less than three weeks later, on March 23, 1989, the same attorney sent a letter to Davis containing similar protestations and identical demands. *Mafia Kingfish* has not been printed since the March 23 letter, to which

Davis twice responded. Contrariwise, the record is bereft of any response to the March 6 letter, and the Kensington paperback version of *Contract on America*— published in 1990—mirrored the earlier printings, not only referring to DiLeo but doing so sans disclaimer.

## II

On April 28, 1989, DiLeo filed his first complaint, naming as defendants Scheim, Shapolsky, and Kensington (as well as their respective insurers). The other shoe dropped on June 2, 1989, when DiLeo filed a complaint against Davis and McGraw–Hill (plus insurers). In style and substance, the complaints were nearly identical: each reprinted book excerpts; each accused the author of making "false," "defamatory," "libelous," and "injurious" statements about "the plaintiff, Dr. Lucas A. DiLeo"; each paraphrased the letter sent by DiLeo's erstwhile attorney; each drew upon a number of liability theories, including defamation and invasion of privacy; and each prayed for equitable relief in addition to damages (both compensatory and punitive).

The responsive pleadings, drawn by different hands, lacked the continuity of DiLeo's complaints but shared traits nevertheless. Davis, McGraw–Hill, and the *Contract on America* defendants filed separate answers, three all told, which denied most of DiLeo's allegations and claimed as an affirmative defense the privilege of "fair reporting." Also recurrent in the answers was the theme that the plaintiff DiLeo might not be the DiLeo referred to in the Report—and thus might not be the DiLeo about whom Davis and Scheim had written. Davis and McGraw–Hill pled this last point as an affirmative defense; the Scheim–Shapolsky–Kensington answer, on the other hand, gave the issue a lower profile, enfolding it in other, unrelated affirmative defenses.[4]

---

**3.** John H. Davis, *Mafia Kingfish: Carlos Marcello and the Assassination of John F. Kennedy* (1989) (internal citations omitted).

**4.** For example, the *Contract on America* defendants' third affirmative defense reads: "The references to Dr. Lucas A. DiLeo, *if in fact such person is the plaintiff,* in the publications com-

On December 18, 1989, McGraw–Hill took the offensive and filed a motion for summary judgment comprising three noteworthy arguments. First, picking up where its answer had left off, it contended that DiLeo, in answering interrogatories, had conceded that the statements in *Mafia Kingfish* pertaining to a "Dr. Lucas A. DiLeo" were not "of and concerning" him but, instead, were written about a different Dr. DiLeo. Second and independently, it insisted that the fair reporting privilege insulated it from liability, in that Davis had merely relayed to his readers what had already made its way into the Report. Finally, privilege or no privilege, it argued that DiLeo had fallen short of stating an invasion of privacy claim because, among other reasons, *Mafia Kingfish* dealt with an issue of public concern. In an opposing memorandum to McGraw–Hill's motion, DiLeo rebutted these claims, arguing in particular that McGraw–Hill had distorted his interrogatory responses—in his words, "[t]here is and has only been one Dr. Lucas A. DiLeo practicing in the greater New Orleans area for at least the past twenty years"—that the otherwise applicable privilege of fair reporting had been abused, and that his complaint and affidavits in fact made out a viable "false light" invasion of privacy claim.

In its memorandum opinion of March 7, 1990, the district court ruled for McGraw–Hill, dismissing DiLeo's *Mafia Kingfish* complaint in its entirety. DiLeo did win some skirmishes in the court below, which concluded that he was not a public figure; that Davis's words were *per se* defamatory; that the words had been published; and that because "Plaintiff's vigorous allegations of a mistaken identity are not controverted by Defendants, Plaintiff ... has demonstrated that the statements about Dr. DiLeo in the book are false as pertaining to him." The war, however, went to Davis and McGraw–Hill, because of three holdings: first, that the *Mafia Kingfish* "material falls squarely within the ambit of the Restatement [Second] § 611 fair reporting privilege"[5]; second, DiLeo's allegations of omissions, unwarranted interpretations, and malice notwithstanding, that the privilege had not been abused; and third, that DiLeo had no invasion of privacy cause of action owing to the § 611 fair reporting privilege and owing to the fact that the statements in *Mafia Kingfish* were on public record and about a matter of public interest.

Seizing on the trial court's disposition of the *Mafia Kingfish* complaint, the *Contract on America* defendants moved for summary judgment on April 11, 1990, citing grounds substantially the same as those cited by McGraw–Hill in its December 1989 motion. The court granted this motion in an order and opinion issued June 21, 1990, which incorporated by reference much of the opinion in *DiLeo v. Davis*. Despite this incorporation, the opinions, although exceedingly similar, are not without their differences, two of which are salient. First, although both cite § 611 in discussing the fair report privilege, the *Scheim* opinion devotes less attention to the Restatement and more to *La.Rev.Stat.Ann.* § 14:49, a listing of the qualified privileges available to criminal defamation defendants. Second, in rejecting DiLeo's claims of abuse, the *Scheim* opinion confronts the issue of whether DiLeo's ex-attorney's letter of March 6, 1989—which denied the book's allegations and demanded a retraction—robbed either Scheim or Kensington of the privilege to fairly report.

### III

DiLeo assigns four errors with each judgment below. First, he argues that by knowingly publishing false statements,

---

plained of represent fair comment and are not libelous under the laws of Louisiana and are protected speech under the First and Fourteenth Amendments to the United States Constitution" (emphasis added).

**5.** § 611 of the Restatement (Second) of Torts (1977) (the "Restatement") reads as follows:

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

slanting the Report data, and omitting its exculpatory portions, the defendants have abused and hence lost the fair reporting privilege. Second, and in any event, he insists that the issue of privilege abuse is a jury question, not a matter for the court, and that the evidence of abuse introduced below was sufficient to stave off summary dismissal. Third, he argues that the fair reporting privilege is inapposite because the defendants in truth relied on Sartor's report rather than the committee Report. And fourth, he challenges the court's assessment of his false light claim. We address these issues presently, albeit in a somewhat reversed order.

■ Before reaching the heart of DiLeo's appeal, however, we note that the district court at one or two points may have made too much and too little use of Louisiana law. In its search for a summary judgment benchmark, the court below turned to *Spears v. McCormick & Co., Inc.*, 520 So.2d 805 (La.App.1987), *writ denied*, 522 So.2d 563 (1988), and *Dwight D. Andrus Ins., Inc. v. Abellor Corp.*, 482 So.2d 1092 (La.App.1986), *writ denied*, 486 So.2d 733, which hold that the "standards used for summary judgment cases are somewhat higher in defamation suits," *Spears*, 520 So.2d at 808, and that a defamation plaintiff opposing summary judgment bears "a burden of proof which is more onerous than usual." *Andrus*, 482 So.2d at 1093. That turn was a wrong turn. Federal courts—irrespective of diversity—are to employ the summary judgment standard of *Fed.R.Civ.P.* 56. *Lavin v. New York News, Inc.*, 757 F.2d 1416, 1419 (3rd Cir.1985); *see also Reid v. Sears, Roebuck and Co.*, 790 F.2d 453 (6th Cir. 1986). That oft-repeated standard, which we now apply, is that summary judgment is. not appropriate unless "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56.

Still, the district court, in *Davis* if not in *Scheim*, was perhaps too eager to treat

§ 611 of the Restatement as Louisiana substantive law. Our research and that of the parties have unturned no Louisiana case citing the section.[6] That is not to say that we need ignore the Restatement; rather, it means that, in seeking answers to the questions posed by DiLeo's assignments of error, we must look first to Louisiana's own substantive rules and ascertain whether they vary from the Restatement's common law compilations.

### A

■ We start by addressing DiLeo's third and fourth assignments of error, one of which has merit but neither of which detains us long. The third argument's premise—that the defendants relied on the Sartor manuscript rather than the Report itself, notwithstanding the fact that they never had access to the manuscript other than through the Report—suffers from a misconception of what it means to rely on an official document. The fact that *Contract on America* and *Mafia Kingfish* cited the Report, which in turn cited Sartor, does not mean that Sartor was the defendants' source; indeed, under such logic, the privilege would be little more than a cipher, since most if not all official documents quote non-official sources, often to excess. Moreover, the Louisiana Supreme Court rejected an analogous argument in *Leininger v. New Orleans Item Publishing Co.*, 156 La. 1044, 101 So. 411 (1924), when it treated as privileged a newspaper account of a report that had been submitted to a public safety commission during open session. Thus, if the defendants are not able to cloak themselves in the fair reporting privilege, it is not for this reason.

■ DiLeo's argument against the handling of his false light claim, however, is more compelling. The trial court dismissed the claim largely on the basis of its finding that the objectionable statements in *Contract on America* and *Mafia Kingfish* were drawn from a public record and touch upon an issue of public interest. Even if

---

6. In point of fact, although it relied on § 611 extensively, the trial court came to a similar realization, stating that "Louisiana does not follow the Restatement" and that "[t]here are no Louisiana cases which rely upon this Restatement section."

this finding were true—an issue we do not address—the court's reliance upon it was misplaced. In the "public disclosure of embarrassing private facts" strain of the invasion of privacy tort,[7] the non-private nature of the published material and the public interest in disclosure of that material—whether private or public—are relevant, often dispositive considerations. *See Roshto v. Hebert,* 439 So.2d 428 (La.1983); *Spears v. McCormick & Co., Inc.,* 520 So.2d 805, 810 (La.App.1987); *Mahaffey v. Official Detective Stories, Inc.,* 210 F.Supp. 251 (W.D.La.1962). Nothing in Louisiana law, however, suggests that these factors bear on the disposition of a false light invasion of privacy claim. The propriety of the summary dismissal of this claim, then, hinges upon whether the district court properly applied the fair reporting privilege. To that issue we now turn.

### B

The essence of DiLeo's appeal is whether his charges of privilege abuse foreclosed

the fair reporting defense or, failing that, precluded the trial court from entering summary judgment. First, however, we must address an antecedent issue: whether Louisiana law even recognizes the privilege of fair reporting.[8] No defendant argues that the trial court created the privilege out of whole cloth, and at oral argument counsel for DiLeo declared that Louisiana indeed has made a place for the fair reporting rule. Still, given that § 611 has yet to be cited in Louisiana, and given the district court's reliance on that provision, we would be remiss to accept, without further inquiry, the parties' positions on this issue.

■ Our citations above foreshadow our conclusion. Although Louisiana defamation caselaw may sometimes appear to have developed in "crazy-quilt" fashion, we have little doubt that it treats as privileged fair accounts of legislative reports and their ilk.[9] "A report ... of [judicial proceedings or] proceedings had at a public meeting of a municipal council, in which proceedings the public has an interest,

---

**7.** For a listing of the four "distinct" invasion of privacy torts, *see generally Jaubert v. Crowley Post-Signal, Inc.,* 375 So.2d 1386, 1388 (La. 1979).

**8.** Prosser and Keeton's formulation of this privilege is cogent:

Prior to the recognition of any constitutional privilege to defame, it was clearly recognized to be in the public interest that information be made available as to what takes place in certain kinds of judicial, legislative, and other public proceedings. Therefore, a qualified privilege of a special kind was recognized under which a newspaper or anyone else might make such a report to the public. The privilege rests upon the idea that any member of the public, if he were present, might see and hear for himself, so that the reporter is merely a substitute for the public eye—this, together with the obvious public interest in having public affairs made known to all. The privilege of reporting extends to all legislative proceedings, including the investigations of committees and the deliberations of municipal councils, and to the acts of executive or administrative officials of the national, state or municipal governments, including their official reports and communications.

W. Prosser & W. Keeton, *Prosser and Keeton on the Law of Torts* 836 (5th Ed.1984).

**9.** At this juncture we pause to distinguish a line of cases that stand for a rule akin to but ultimately distinguishable from the fair reporting

privilege. In *Wilson v. Capital City Press,* 315 So.2d 393 (La.App.1975), *LeBoeuf v. Times Picayune Publishing Co.,* 327 So.2d 430 (La.App. 1976), *Melon v. Capital City Press,* 407 So.2d 85 (La.App.1981), and *Bates v. Times–Picayune Publishing Co.,* 527 So.2d 407 (La.App.1988), media defendants who falsely published that a plaintiff had been arrested but who did so in reasonable reliance upon data supplied by law enforcement officials were found free of fault, an essential element in any defamation action. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). With good reason, the *Wilson, LeBoeuf, Melon,* and *Bates* courts did not reach the issue of fair reporting. Although an arrest may well be an "official proceeding" for purposes of the privilege, data proffered by police officers in connection with an arrest are likely not. *See* Restatement (Second) of Torts § 611 comment h (1977). Moreover, the data in these cases were provided to the media in guises almost assuredly unofficial and undeserving of public record status. *See Wilson,* 315 So.2d at 393 (newspaper published information acquired from police public relations director); *LeBoeuf,* 327 So.2d at 430 (police public relations director, who in turn relied on internal "incident report"); *Melon,* 407 So.2d at 85 (news release issued by sheriff's department); *Bates,* 527 So.2d at 407 (unnamed source at police department).

when the report is a fair and accurate one ... is privileged...." *Leininger, supra. Bellis v. Times–Picayune,* 226 F.Supp. 552 (E.D.La.1964) ("qualified privilege which exists in favor of publication of official proceedings" is "well-recognized"); *Buratt v. Capital City Press,* 459 So.2d 1268, 1270, n. 2 (La.App.1984) (recognizing a "limited privilege" to publish "public records"); *Francois v. Capital City Press,* 166 So.2d 84, 88 (La.App.1964) ("substantial authority" indicates "that the publication of information contained in public records and in the proceedings of public bodies ... is protected by a qualified or conditional privilege"). In addition to caselaw, *La.Rev.Stat.Ann.* § 14:49, cited by the district court in its *Scheim* opinion, provides for some a fair reporting shield:

*§ 49. Qualified Privilege*

A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:

(1) Where the publication or expression is a fair and true report of any judicial, legislative, or other public or official proceeding, or of any statement, speech, argument, or debate in the course of the same.[10]

Having cleared this initial hurdle by concluding that Louisiana recognizes the privilege to report fairly, we are now free to take up the issues posed by DiLeo's allegations of abuse. As DiLeo suggests, Louisiana's privilege of fair reporting is not absolute but, rather, is subject to at least three limitations, any one of which can render it a nullity. First, like all qualified privileges,

the fair reporting privilege is defeated by proof that the defendant's statements were made with "actual malice," that is, with knowledge that they were false or with reckless disregard for their truth value. *La.Rev.Stat.Ann.* § 14:49; *Buratt,* 459 So.2d at 1270, n. 2; *Adserv Corp. v. Lincecum,* 385 So.2d 432 (La.App.1980); *State v. Lambert,* 188 La. 968, 178 So. 508 (1938); *Francois v. Capital City Press,* 166 So.2d 84, 90 (La.App.1964).[11]

Second, the privilege is unavailable if, in the words of § 14:49, the defendant publishes less than a "fair and true" account of the official report. Although we are shown no Louisiana cases interpreting this "fair and true" restriction, we think it analogous to the Restatement requirement that the defendant's account be a "fair and accurate" rendition of the original.[12] Comment F to § 611 fleshes out this stricture:

The rule stated in this Section requires the report to be accurate. It is not necessary that it be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings.

Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear

---

**10.** Though § 14:49 is part of the Louisiana Criminal Code, the "Reporter's Comments" that accompany it cite both civil and criminal defamation cases. Moreover, the Louisiana Supreme Court has indicated that the section "is a substantial codification of the law of 'qualified privilege' recognized by the Louisiana civil jurisprudence." *Mashburn v. Collin,* 355 So.2d 879, 886, n. 2 (La.1977).

**11.** On this point, incidentally, Louisiana law parts ways with the Restatement, under which the privilege holds fast "even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." § 611, Comment A.

*See also* W. Prosser & W. Keeton, *Prosser and Keeton on the Law of Torts* 838 (5th Ed.1984) ("there is substantial judicial authority to the contrary [of the Restatement position], and the result does not appear to be constitutionally mandated").

**12.** *See Leininger, supra,* which preceded the passage of § 14:49 and required that the publication be both "fair and accurate." Note that a construction of § 14:49(1)'s "fair and true" requirement that demanded the defendant's publication not be false would eviscerate the privilege and run afoul of § 14:49's admonition that a qualified privilege applies "regardless of whether the publication is true or false...."

or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.[13]

At least one Louisiana case has placed a related yet more severe curb on the privilege where, as here, the publication summarizes (rather than reprints in its entirety) public data. In *Buratt, supra,* a longtime Ascension Parish public servant—Buratt—brought a defamation action against a newspaper for printing that he and an unnamed "partner" owned an Ascension subdivision and that the two (perhaps improperly) had asked a parish contractor to overlay certain of "their" subdivision's roads. The article, in large part a summary of public records kept by the Louisiana Attorney General, did contain some exculpatory material, such as Buratt's statement that he "never developed any property in the area." However, the newspaper made but partial use of the records, neglecting to summarize, for instance, a statement by the "partner" that "completely refuted ownership of the subdivision by Buratt." *Buratt,* 459 So.2d at 1270. In affirming a judgment for Buratt, Louisiana's First Circuit Court of Appeals adopted the trial court's holding that "any use of ... public records must accurately and fairly represent what is contained in the *entirety* of the said public records." *Id.* at 1272 (emphasis added). What is more, said Louisiana's First Circuit, by violating this principle the newspaper had acted with actual malice, a prerequisite given that Buratt was a public figure.[14]

While not questioning these limitations, the defendants do dispute DiLeo's claim that each was violated in the instant case. On the issue of malice, for instance, they insist that proof of such is wholly absent from the record. In defense of the fairness of their respective works, the defendants collate *Mafia Kingfish, Contract on America,* and the Report, pointing out myriad similarities. Finally, with regard to DiLeo's allegations that the books selectively reflect the report data, the defendants decry the significance of any omissions, arguing that they are not so weighty as to place the books outside the privilege's purview.

However, for all their attention to DiLeo's argument that the district court should have found abuse of the fair reporting prerogative, the defendants offer only bromides in rejoinder to DiLeo's ancillary contention: that the district court *should not* have found an *absence* of abuse. Before and during oral argument, DiLeo insisted that the question of privilege abuse is an issue of fact squarely within the province of a jury, and that the record contains sufficient evidence on this score to avoid summary judgment, if nothing else. Although Louisiana law gives us precious little guidance,[15] the authorities we have reviewed uniformly instruct that abuse issues are indeed jury questions, so long as the facts admit of more than one conclu-

---

**13.** Restatement (Second) of Torts § 611 comment f (1977).

**14.** "[I]f public records are going to be summarized, the summarization should be based on the entirety of the records available. The summary in this case was not. The summary did not include a summarization of other available records which completely refuted the thesis of the article. The disregard of the other available statements which could also have been summarized without further research or investigation, and which would have changed the whole tenor of the disputed statement in the article with reference to Buratt is what makes this a violation of the *New York Times* actual malice rule." *Buratt,* 459 So.2d at 1270.

**15.** Louisiana law clearly states that the determination of actual malice rests in the hands of the jury. *See, e.g., Mashburn,* 355 So.2d at 879. It has also made clear that, "when the facts are not disputed," the issue of whether a privilege attaches in the first place "is purely one of law." *State v. Lambert,* 188 La. 968, 178 So. 508 (1938). Beyond that, however, it appears to be silent.

sion.[16] As the foregoing implies, the defendants, despite our prodding at oral argument, have mustered no cases suggesting that abuse is ordinarily a question of law; the sections of their briefs ostensibly devoted to this issue merely set out, in varying detail, the summary judgment standard of Rule 56. We also observe that the district court's opinions bespeak only a halting inquiry into the issue of whether abuse poses a legal or factual question.[17]

 Accordingly, we hold that Louisiana law invests a jury with the responsibility of deciding if the qualified privilege of fair reporting has been abused. The sufficiency of evidence caveat to this holding frames our remaining question: whether the record would permit a reasonable jury to conclude that *Mafia Kingfish* or *Contract on America* was published with actual malice, or was not a "fair and true" summary, or was an incomplete distillation as in *Buratt.*

We answer this question in favor of DiLeo. Putting to one side the issue of actual malice, we cannot say that neither of the other abuse theories warrants jury consideration. *Mafia Kingfish* presents the easier case: The differences between it and the Report, while not necessarily striking, are potentially significant in the aggregate. We count at least five: (1) Davis refers to Sartor as a "respected journalist," an epithet nowhere to be seen in the Report. (2) According to the book, "Sartor concluded that there was a *high probability* that organized crime had played a role in Dr. King's assassination." [18] The Report, however, attributes no such certainty to Sartor;

if anything, it indicates the converse, stating that "Sartor ... had provided *no information* about how he discovered that such a meeting [between Ray and reputed crime figures had] occurred," "wrote that he was *not aware* of the subject of the meeting," and merely *"speculat[ed]* that this meeting was in some way linked to the assassination of Dr. King." [19] (3) *Mafia Kingfish* conveys to readers that the Committee reached its conclusion only "[u]pon running into [a] stone wall of denials"; it neglects to mention that the two sources fingered by Sartor, Pecot and Lyons, balked at corroborating Sartor's account, and that their reticence in all likelihood contributed to the committee's conclusion. (4) Compounding this last omission, Davis indicates that Sartor's findings were based "primarily on a report he had received from a *reliable* source." (5) Finally, the book avers that Sartor himself made mention of a "Dr. Lucas A. DiLeo," although in truth he mentioned a "Lucas Dilles," whom the committee took to be "Dr. Lucas A. DiLeo."

The differences between the Report and Scheim's summary of it are not as numerous, possibly because Scheim's book spends less time with the Report than does *Mafia Kingfish.* Be that as it may, *Contract on America* suffers from an imperfection arguably more weighty than any of those listed above: The omission of the committee's conclusion that it "found no support for Sartor's contention that Ray met with persons involved in organized crime in New Orleans before the assassination." Admittedly, that finding is no rousing vindication of DiLeo, nor does it even denote that

---

16. "Whether the occasion was a privileged one is a question to be determined by the court as an issue of law, unless of course the facts are in dispute, in which case the jury will be instructed as to the proper rules to apply. Once the existence of the privilege is established, the burden is upon the plaintiff to prove that it has been abused.... Unless only one conclusion can be drawn from the evidence, the determination of the question whether the privilege has been abused is for the jury." W. Prosser & W. Keeton, *Prosser and Keeton on the Law of Torts* 835 (5th Ed.1984) (citations omitted). Restatement (Second) of Torts § 619(2) (1977). *See, e.g., Schiavone Construction Co. v. Time, Inc.,* 847

F.2d 1069, 1089 (3rd Cir.1988); *Lavin v. New York News, Inc.,* 757 F.2d 1416 (3rd Cir.1984).

17. In the *Davis* opinion, the district court cited our holding in *Levine v. CMP Publication, Inc.,* 738 F.2d 660 (5th Cir.1984), where (according to the district court) we "held that it was a jury question whether the defendant publisher could invoke Texas' privilege for fair, true and impartial accounts of public proceedings." Beyond this, the opinions below make no mention of whether abuse is an issue for judge or for jury.

18. Emphasis added.

19. Emphasis added.

Sartor's accusations are baseless. It does tend to exonerate DiLeo, however, and it is after all the committee's conclusion, not a mere penultimate finding. By drawing on inculpatory Report data without adverting to the committee's somewhat exculpatory conclusion, Scheim's work at least raises a colorable question under *Buratt*, if not under the abuse rule codified in § 14:49.

The sufficiency-of-evidence component of our holding is consistent with others that have tackled the fair reporting abuse issue. In *Levine v. CMP Publications, Inc.*, 738 F.2d 660 (5th Cir.1984), this court refused to conclude that, as a matter of law, magazine articles published by the defendant were "fair, true and impartial" accounts of public proceedings entitled to a Texas statutory privilege. Rather, we held that the inaccuracies there, few in number and no more glaring than those in the instant case, "raised fact questions" and "presented a jury question." *Levine*, 738 F.2d at 668–669. On the other hand, in *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1088 (3rd Cir.1988), a *Time* article that used yet excised exculpatory material from an internal FBI memorandum was held as a matter of law *ineligible* for the fair reporting privilege. In an effort to distinguish *Schiavone*, the defendants argue that the references elided from the FBI memorandum were more damning to *Time*'s article than was the committee conclusion to *Contract on America*. Even were this true, however, if the *Time* article could not "under any definition be deemed either fair or accurate," *Schiavone*, 847 F.2d at 1089, clearly the omission in Scheim's text warrants the attention of a jury. *Compare Lavin v. New York News, Inc.*, 757 F.2d 1416 (3rd Cir.1985).

Although we would hope it unnecessary, we pause to emphasize the circumscribed nature of our decision: Abuse is a jury issue and, on the record before us, a reasonable jury could find that the defendants have in point of fact abused and thus forfeited their privilege of fair reporting. Naturally, DiLeo may well stumble in his attempt to persuade the jury that impermissible liberties were taken with the Report or that the defendants' writings defamed him. Our point is simply that DiLeo should have just such an opportunity.

## IV

A few loose ends remain. First among these threads is the trial court's reliance on *Hopkins v. Keith*, 348 So.2d 999 (La.App. 1977), *Bill Partin Jewelry, Inc. v. Smith*, 467 So.2d 188 (La.App.1985), and *Dwight W. Andrus Insurance, Inc. v. Abellor Corporation*, 482 So.2d 1092 (La.App.1986). To the extent that the district court thought that these holdings have some bearing on the fair reporting privilege, more specifically on the question of whether the privilege has been abused,[20] we think it was mistaken. *Hopkins, Bill Partin Jewelry*, and *Andrus Insurance* stand for proposition that, when a media defendant reports on accurate "legal and judicial proceedings and records," venial mistakes are not actionable owing to the fact that "some errors and inaccuracies are bound to occur in the [media's] use of technical terms." *Bill Partin Jewelry*, 467 So.2d at 190. *See also Andrus Insurance*, 482 So.2d at 1094 ("In such a case, an error will only give rise to liability if it is a significant variation from the truth"). These cases actually do not touch upon the fair report license, which covers wholly true and wholly false publications alike.

■ A second unresolved issue involves three alternative arguments raised by McGraw–Hill and the *Contract on America* defendants in support of the judgments below. Two of these arguments are clearly meritless. The first, that the statements in *Contract on America* are not defamatory *per se* because they level no accusations of criminal conduct, ignores Scheim's allusions to DiLeo's "record for ... minor

---

20. For instance, when evaluating DiLeo's argument that *Contract on America*'s elision of the Report's conclusion constituted abuse, the trial court wrote: "When measured against the standards set forth in *Hopkins* and *Dwight Andrus*, this court concludes that Defendants fall within the ambit of the fair report privilege. Defendants' omission of the [Report's] semi-exculpatory statement is not a significant variation from the truth."

offenses"[21] and overlooks the Louisiana rule that a statement may impute a crime without using express terms or technical accuracy. *Taylor v. Town of Arcadia*, 519 So.2d 303, 306 (La.App.1988). The second, that the statements in *Mafia Kingfish* are non-defamatory because they merely parrot allegations made in its Report, "confuses the concept of defamatory words with [that of] the source of the words." *Scheim*, mem. op. at 4.

But the third argument, made by McGraw–Hill, cannot be sloughed off so easily: that the statements in *Mafia Kingfish* were not written about the plaintiff DiLeo. As it did in its summary judgment motion, McGraw–Hill relies on DiLeo's interrogatory answers to contend that New Orleans was once home to *two* Dr. Lucas A. DiLeos—and that the DiLeo to whom the committee and Davis refer is different from the DiLeo who filed the instant complaint and lodged the instant appeal. Whether there are two Dr. Lucas A. DiLeos is certainly not established in the record before us. If, however, McGraw–Hill is correct—that is, if this case poses a problem of mistaken identity—this DiLeo may be well served to forego a defamation action in favor of some other recovery theory, perhaps a claim alleging a negligent failure to sufficiently identify the real Dr. Lucas A. DiLeo. *See Weatherall v. Dept. of Health and Human Res.*, 432 So.2d 988, 994 (La.App.1983) (element of the tort of defamation is that the defendant's statement be "of and concerning" the plaintiff); *Ryder v. Time, Inc.*, 557 F.2d 824 (D.C.Cir. 1976). We do not decide this legal issue, however, nor do we express any views regarding the merits of McGraw–Hill's misidentification argument. This loose end we leave for the district court.[22]

## V

For the foregoing reasons, we REVERSE the judgments of the district court dismissing DiLeo's complaints in their entirety. Further, we REMAND each case for additional proceedings that comport with this opinion.

REVERSED and REMANDED.

---

**21.** Scheim, *Contract on America: The Mafia Murder of President John F. Kennedy* (1988) 285 (quoting page 388 of the Report).

**22.** Having said this, we cannot help but note that the district court's resolution of the mis-

identification issue may force a reexamination of its falsity holding made in the *Davis* case: that the statements in *Mafia Kingfish* are false because they refer "to another DiLeo." *Davis*, mem. op. at 5.