601 So.2d 792 (1992)
Martha E. SASSONE and Joseph L. Montgomery
v.
William S. ELDER and Loyola University, a Louisiana Corporation.
No. 91-CA-1229.
Court of Appeal of Louisiana, Fourth Circuit.
May 28, 1992.
Writ Granted October 9, 1992.
*793 John D. Rawls, New Orleans, for appellants.
Thomas A. Rayer, Denechaud and Denechaud, New Orleans, for appellees.
Before BARRY, CIACCIO and LOBRANO, JJ.
CIACCIO, Judge.
Appellants, Martha E. Sassone and Joseph L. Montgomery, are attorneys who undertook to represent Marie Giordano Lloyd and others in a property dispute with the State of Louisiana. Events surrounding this litigation were investigated and ultimately broadcast on the WWL-TV station through investigative reporter Bill Elder. Following these broadcasts, Sassone and Montgomery commenced this defamation claim for damages against the television station and Elder. The trial court granted defendants' motion for summary judgment dismissing the plaintiffs' defamation claim. Plaintiffs have appealed from the granting of the summary judgment and from various orders of the trial court rendered during the course of the proceedings. For the reasons stated more fully herein, we reverse the summary judgment, but in all other respects, we affirm the rulings of the trial court.
Before analyzing the legal sufficiency of plaintiffs' claims, it is necessary to briefly summarize the context in which this dispute arose. The saga began in 1981 when Marie Giordano Lloyd, a resident of Gretna, Louisiana, initiated a claim to ownership of several thousand acres of Louisiana marshland situated in Plaquemines Parish. The land was originally obtained in the 1800's by Juan Ronquillo through a land grant from the Spanish government. The land, which is allegedly rich in oil and minerals, is referred to as the Cheniere-Ronquillo tract, and was subsequently transferred to the State of Louisiana.
Alleging she was an heir to Juan Ronquillo, Mrs. Lloyd began taking steps to establish her rights of heirship and claim to the property. During 1981 and 1982, Mrs. *794 Lloyd held public meetings in an effort to locate other heirs of Ronquillo whom she maintained also had an interest in the property. Mrs. Lloyd and her former attorney eventually located hundreds of persons who allegedly had a stake in this tract of land. They began obtaining written contracts of contingent fee employment from these potential heirs for the institution of legal proceedings against the State of Louisiana. These contracts provided that Mrs. Lloyd and her attorney would each receive twenty-five percent of any sums collected for their interest in the property. At some point, appellants Sassone and Montgomery were substituted as counsel for Mrs. Lloyd and these heirs.
In the early spring of 1986, several of these potential heirs who had been contacted by Mrs. Lloyd began to have concerns regarding the legitimacy of her claims. These individuals contacted William S. "Bill" Elder (hereinafter "Elder") an investigative news reporter employed by the WWL television station in New Orleans. Elder subsequently interviewed each of these individuals, and began an investigation into their assertions against Mrs. Lloyd.
On May 6, 1986, Elder and a WWL cameraman attended a meeting at a VFW hall in Gretna which had been arranged by Mrs. Lloyd and her attorneys, appellants herein. Hundreds of potential heirs and their families were present at this meeting in an attempt to learn more information of Mrs. Lloyd's efforts concerning title to this property. Elder and the WWL cameraman interviewed various persons in attendance at the meeting, including Mrs. Lloyd, and filmed portions of the meeting.
In connection with this investigation, Elder also conducted an interview with Douglas Greenburg, the district attorney for the Parish of Terrebonne, where a grand jury was conducting an investigation into Mrs. Lloyd's activities.
As a result of this investigation, Elder and WWL-TV published a series of television newscasts beginning on June 1, 1986 and continuing through July 7, 1986. Plaintiffs' claim for damages is based on allegations and statements made during these broadcasts which they contend are defamatory against them.
On November 6, 1986, Sassone and Montgomery instituted this litigation against Bill Elder and Loyola University, the owner of the WWL television station. In their petition, plaintiffs allege that the series of reports by Elder were "a deliberate and calculated attempt to smear and besmirch the professional reputation of the plaintiffs by the broadcast of "knowingly false and misleading allegations" concerning the plaintiffs. Plaintiffs also requested a temporary restraining order preventing defendants from disposing of the video tapes containing the subject broadcasts and any written reporter's notes concerning these broadcasts. The trial court granted the TRO and subsequently entered a preliminary injunction on this matter without objection of defendants on November 24, 1986.
On November 26, 1986, plaintiffs filed a motion for preliminary default alleging that defendants had failed to answer within the time period proscribed by law. On December 2, 1986, plaintiffs attempted to confirm the default, but the trial court refused and ordered plaintiffs to notify defendants' attorneys that the answer must be filed within one week. Plaintiffs' counsel notified defense counsel at 9:35 a.m. on December 3rd and an answer on behalf of defendants was filed on the same date at 10:35 a.m. Defendant Elder also filed a reconventional demand for defamation against plaintiffs at this time. Plaintiffs then requested a written minute entry of the decision concerning the default, which request was denied by the trial court.
The parties then began discovery proceedings in this case. Plaintiffs propounded a set of eighty-six Requests for Admissions concerning the statements made during the broadcasts, and defendants filed an answer to the requests either denying the requests or stating the defendants had lack of information to answer the requests. Plaintiffs filed a motion to compel answers to the requests for admissions, and following a hearing on this matter, the trial court *795 sustained defendants' objection to these requests.
Various depositions were taken by plaintiffs, including those of Bill Elder, Joe Duke, the president of WWL, and District Attorney Greenburg. Plaintiffs attempted to depose defense counsel on the subject of whether defendants sought the advice of counsel prior to airing the broadcasts. Defense counsel invoked the attorney-client privilege, and plaintiffs filed a Motion in Limine on this issue. The trial court subsequently rendered judgment which prohibited the deposition of defense counsel but restricted the testimony at trial concerning the advice of counsel.
Defendants then filed a motion for summary judgment attaching the videotapes of the disputed broadcasts, written transcripts of the broadcasts and the deposition of Bill Elder. Plaintiffs filed an opposition to this motion, including affidavits of both Sassone and Montgomery.
On March 13, 1991, the trial court granted defendants' summary judgment dismissing plaintiffs' petition. The court assigned the following reasons for judgment:
"This is a defamation suit that arises out of a news story by Mr. Elder at WWL-TV.
Judge Rubin in Davis v. NBC, 320 F.Supp. 1070 (USDC, E.D., La., 1970) at page 1073 stated that:
The decision on a motion for summary judgment requires an uneasy choice between the opponent's right to a jury's determination of his case and the interest of the proponent in the avoidance of trials that serve no useful purpose ... The plaintiff's right to his day before the jury is not to be cavalierly avoided. But the failure to dismiss a libel suit might necessitate long and expensive trial proceedings which, if not really warranted, would themselves offend the principles enunciated in Dombrowski [v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22] because of the chilling effect of such litigation.
For the reasons enunciated in the brief of the defendants the Court grants summary judgment and dismisses the plaintiffs lawsuit."
Appellants present us with this statement of issues on appeal:
1. Whether the trial judge erred in failing to enter a confirmation of default herein.
2. Whether the trial judge erred in failing to make a minute entry on its refusal to confirm a judgment in default.
3. Whether the trial judge erred in sustaining objections to all eighty-six (86) of the plaintiffs' requests for admission.
4. Whether the trial court erred in granting summary judgment for the defendants.
5. Whether the trial judge erred in denying and dismissing the plaintiffs' motion in limine.
Other than the granting of the summary judgment, the issues assigned by appellants concern interlocutory orders which are more properly raised by supervisory writ. Nevertheless, we will address each of these issues.
Appellants' first argument that the trial court erred in failing to enter a confirmation of default is without merit. A judgment of default may only be confirmed if no answer has been filed in the record. La.C.C.Pr. art. 1702. The record in this case indicates that an answer was filed on behalf of all defendants on December 3, 1986. Thus, the trial court did not err in failing to confirm the default. Based on our holding on this issue, we need not reach the second issue presented on appeal regarding the trial court's failure to enter a minute entry.
Appellants next argue that the trial court erred in sustaining defendants' objections to plaintiffs requests for admissions. Although this ruling was not reduced to a written judgment, we have reviewed the eighty-six requests for admissions and defendants' written responses thereto, and conclude that the requests call for legal conclusions which defendants are not required to make, or matters outside of defendants' knowledge or information. We *796 find no error of the trial judge in sustaining defendants' objections.
Appellants next contend that the trial court erred in ruling on their Motion in Limine. By this motion, plaintiffs sought to limit the testimony concerning advice of counsel to defendants prior to these broadcasts, or in the alternative to disqualify and depose defense counsel. Our interpretation of the judgment on plaintiffs' motion is that no testimony or evidence concerning advice of counsel will be offered or permitted at trial. To the extent this interpretation does not comport with the judgment rendered by the trial court, plaintiffs are free to re-urge this motion prior to trial.
We turn now to the main issue of plaintiffs' appeal: the granting of the summary judgment in defendants' favor. Defendants contend that the standard to be used for the denial of a summary judgment is somewhat higher in defamation cases. They argue that in order to defeat summary judgment, plaintiffs bear the more onerous burden of proving with "convincing clarity" that the alleged defamatory statements made were false or with reckless disregard for the question of their falsity, citing Cavalier v. Houma Courier Newspaper, 472 So.2d 274 (La.App. 1st Cir. 1985).
However, in the recent case of Doe v. Doe, 941 F.2d 280 (5th Cir.1991), rehearing granted in part and denied in part, 949 F.2d 736 (1991), the Court held that the standard for summary judgment in defamation cases is the same as the standard employed in all other civil cases, that is, summary judgment is not appropriate unless there is no genuine issue as to any material fact, and mover is entitled to a judgment as a matter of law. Although the Doe court relied on Fed.R.Civ.P. 56, this rule closely parallels this state's La. C.C.P. art. 966. We agree with the reasoning set forth in Doe and adopt it as our own. See also, Lavin v. New York News, Inc., 757 F.2d 1416, 1419 (3rd Cir.1985).
Although the district court may have applied a more stringent and consequently erroneous standard in ruling on this summary judgment motion, we must nevertheless determine whether there is any material dispute of fact which, if resolved in plaintiffs' favor, would support the imposition of liability against the defendants.
In order to prevail in a case of defamation under the Louisiana law the plaintiff must prove five elements: defamatory words; publication; falsity; malice, actual or implied, and resultant injury. Williams v. Touro Infirmary, 578 So.2d 1006 (La. App. 4th Cir.1991). Defamatory words have been defined as words which:
"have a tendency to deprive a person of the benefits of public confidence or injure him in his occupation or have a natural tendency to injure the person's reputation. When the words themselves have those results, even without considering extrinsic facts and surrounding circumstances they are defamatory per se. Words which impute a crime to another are defamatory per se. So are words that tend to adversely affect the person's business or profession. When words themselves have a natural tendency to injure a person and his occupation or to injure his reputation, even without considering extrinsic facts or surrounding circumstances, they are defamatory per se."

Elmer v. Coplin, 485 So.2d 171, 176-77 (La.App. 2nd Cir), writ denied, 489 So.2d 246 (La.1986).
Federal courts have long struggled to reconcile state laws of defamation with competing interests of free expression grounded in the constitutional command of the First Amendment.
In New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) the Supreme Court first set forth the standard defining the level of constitutional protection appropriate to the context of defamation of a public official. The Court stated: "[t]he constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'that is, with knowledge *797 that it was false or with reckless disregard of whether it was false or not." Id., 84 S.Ct. at 726. The Court in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), extended this standard to public figures as well as elected public officials. However, with regard to private individuals as plaintiffs in defamation cases, the Supreme Court has held that the states may define for themselves the appropriate standard of liability for a broadcaster of a defamatory falsehood, as long as they do not impose liability without fault. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
In support of their motion for summary judgment, defendants argued that plaintiffs are public figures, and that based on the holding in New York Times Company, supra, plaintiffs are required to prove the statements were made with actual malice. Defendants contend, and the trial court apparently found, that plaintiffs' participation in a matter of public interest, i.e., Mrs. Lloyd's" attempt to convoke a meeting of hundreds of heirs for the purpose of signing employment contracts, renders plaintiffs "limited public figures" and susceptible to the standard of New York Times of proving actual malice.
Plaintiffs are not, however, public figures if their involvement in the controversy is only as lawyers representing a client. Gertz v. Robert Welch, Inc., supra. Only where an individual voluntarily injects himself or is drawn into a particular public controversy may he become a public figure for a limited range of issues. Id., 94 S.Ct. at 3013.
In the present case, as in Gertz, there is no evidence that plaintiffs had achieved general fame or notoriety in the community, apart from their representation of Mrs. Lloyd. Although plaintiffs participated in the May 6, 1986 meeting in Gretna which was made the subject of a television broadcast by defendants, plaintiffs' action in attempting to represent a class of persons on a contingency fee basis does not draw plaintiffs into the public arena. Plaintiffs did not engage the public's attention in this issue, and did not discuss the potential litigation with the press. In fact, plaintiffs requested the news media leave their meeting with clients when Elder appeared unsolicited on May 6. Plainly, plaintiffs did not thrust or voluntarily inject themselves into this public issue, and cannot be considered public figures merely based on their legal representation of a controversial client. In order to defeat summary judgment, then, the plaintiffs must prove that defendants acted with some level of fault as required by Gertz, rather than the actual malice requirement set forth in New York Times.
The statements made during the television broadcasts which plaintiffs allege are defamatory may be summarized as follows:
From the noon broadcast on June 1, 1986:
1. Elder:
Before long people were complaining to authorities in several Parishes. The case however, interested only one. District Attorney Doug Greenberg [sic: should be Greenburg] of Terrebonne Parish began digging into the matter.
Doug Greenberg:
D.A.
"It's an extortion, I think that it smacks of a fraud. The taking of anything of value from someone by fraudulent conduct or representation or practice."
Elder:
Greenberg says he became angered over who the victims were.
Greenberg:
District Attorney
"They [sic] mostly little simple people, who probably are not the most educated or informed and very gullable [sic] and very human."
Elder:
Greenberg's investigation centered on this contract. In it Marie Lloyd Giordano obligates the heirs to pay 25-percent to her and 25-percent to the lawyers, in the event of any settlement. It also obligates the signee to forfeit 50-thousand *798 dollars, should they try and break the contract. Now during the week of May sixth, Marie Lloyd Giordano and her attorneys, Joey Montgomery and Martha Sassone [sic], call a meeting at the V.F.W. Hall in Gretna. The purpose is to change the contract, the one which the district attorney is looking into.
2. Elder:
Let me ask you why are you afraid for us to look at the contract?
Joe Montgomery:
This is our personal business, this is a contract, contingency contract. We're not interested in having the news media in on this. I don't think it's any of your affair. But you may, we talked to you about it before, this is our own business. I think this is an internal matter of the group and I think its a matter of .."
Elder:
You're not trying to take these people to the cleaners, are you?
Montgomery:
No Sir Ree.
3. Elder:
Outside of the hall, some people were beginning to get upset over what had taken place.
* * * * * *
Would-be Heir
"You are not allowed to talk to an attorney, if you talk to any attorney you are charged $50dollars. My daughter tried to reach the attorneys, they do not have a working number.
From the 10 P.M. broadcast on June 17, 1986:
4. Elder:
Was it wrong for Marie and her attorneys, Martha Sassone (sic) and Joey Montgomery to try and rush nearly a thousand people into signing a binding legal contract?
5. Elder
During that meeting at the V.F.W. Hall in Gretna late in April.
Leo J. Salis:
All we know is Joe and Martha, no last names, and they said if you have only questions, we're not going to answer no questions tonight.
Elder:
"You're telling me that no one in this hall had any idea what the last names were of these two lawyers?"
Leo Salis:
"Ah, no body, no one that I spoke with, they had about a thousand people ..."
Elder:
"Did you ask? Did you ask?"
Leo Salis:
"Yea, some people were asking me, and they were asking each other ... what's their last names, where are their offices, and nobody knew."
Plaintiffs contend that the statements made by defendant Elder during the television broadcasts were accusations of unethical conduct made against them as attorneys and therefore were defamatory. They further contend that there is sufficient evidence to prove that the statements were false and that Elder knew or should have known of the falsity prior to the broadcasts.
In opposition to defendants' motion for summary judgment, plaintiffs filed into the record several affidavits. The affidavits of Joe Montgomery and Martha Sassone, plaintiffs herein, state that the WWL broadcasts included unauthorized footage from a private meeting between attorney and clients. The affidavits further state that at the beginning of the meeting, Mr. Montgomery introduced both himself and Ms. Sassone using their full names. Further, the affidavits state that both Mr. Montgomery and Ms. Sassone have always maintained working telephone numbers during their practice of law. Ms. Sassone's affidavit states that Mr. Elder telephoned her on this working number several times during April, May and June, 1986. Both affidavits state that the professional reputation of plaintiffs were injured as a result of these broadcasts.
In addition, plaintiff introduced the affidavit of Pierre DeGruy, a former investigative reporter for two New Orleans television stations, which makes the following statements:

*799 I have reviewed the broadcasts that are the subject of this litigation. Based on my review of those broadcasts, and my expertise and specialized knowledge in the field of broadcast communications and news reporting, it is my opinion that those broadcasts were fundamentally unfair to the Plaintiffs, Martha E. Sassone and Joseph L. Montgomery, and that those broadcasts violated industry standards for ethical and accurate reporting.
Plaintiffs also included the deposition of Doug Greenburg which states that the television broadcasts do not accurately reflect the content of his interview with Mr. Elder.
Defendants contend that the statements which plaintiffs allege are defamatory are expressions of opinion made by the press without knowing or reckless falsity about a matter of public concern and are therefore fully protected by the First Amendment constitutional guarantee of freedom of expression, citing Mashburn v. Collin, 355 So.2d 879 (La.1977). Defendants argue that such expressions fall within the fair comment privilege and are therefore not actionable unless they were made with knowing or reckless falsity.
The Supreme Court took up the issue of constitutional protection of expressions of opinion relating to matters of public concern in Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In Milkovich, the court refused to hold that all statements of opinion are entitled to a constitutional privilege to ensure freedom of expression guaranteed by the First Amendment. Such statements, although couched as opinion, may be actionable where they imply the existence of false and defamatory facts.
Applying the Milkovich standard to the present case, the narrow issue before this court is whether the statements made in the WWL broadcasts can reasonably be understood to state or imply actual facts about plaintiffs. In determining that issue, we must consider the nature and meaning of the language used, including the verifiability of the statements and the overall context in which the statements appeared.
We have carefully reviewed the videotapes of the subject broadcasts, the transcripts of those broadcasts, the affidavits of plaintiffs and Pierre DeGruy, and depositions of Bill Elder and Doug Greenburg which were filed in the record, as well as the applicable law. We cannot say, as a matter of law, that the statements which were broadcast by WWL and are repeated herein do not imply actual facts about plaintiffs regarding their practice of law. We conclude that the statements may give rise to the connotation that plaintiffs violated certain ethical standards in the legal profession. Our review of the record indicates that this connotation is sufficiently factual to be susceptible of being proved true or false.
Although we do not now pass on the issue of whether the statements are actionable, we hold that various statements of fact were alleged concerning Martha Sassone and Joe Montgomery and this court cannot say, on this motion for summary judgment, that the statements are not capable of defamatory meaning.
A reasonable jury could conclude that the statements made in these broadcasts imply that plaintiffs were trying to deceive their clients for monetary gain. Such a conclusion would give rise to an actionable assertion of fact. The same jury could also decide that some or all of those statements do not suggest the existence of provable facts. In that case, under the principles enunciated in Milkovich, the statements would be constitutionally protected.
Only in the clearest cases may courts, applying the Milkovich principles, determine as a matter of law that the assertions before them state or imply actual facts and are therefore entitled to no constitutional protection. Where reasonable people might give conflicting yet plausible interpretations of the statements made, a fact-finder should determine the nature of the statements. If the statements are statements of opinion relating to matters of public concern which contain a provably false factual connotation and if they can reasonably be interpreted as stating actual facts, then under the holding in Milkovich, *800 they are actionable factual assertions. In such case, there remain triable issues of fact of whether the statements constitute defamation under state law.
We conclude that the trial court's action in granting defendants' summary judgment was erroneous. Accordingly, for the reasons assigned, the interlocutory orders rendered by the trial court are affirmed. The judgment of the trial court granting defendants' motion for summary judgment is reversed and this case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED and REMANDED IN PART.