EUGENE T. LANE, JR. *vs.* MPG NEWSPAPERS & others.[1]

Plymouth. December 3, 2002. - January 16, 2003.

Present: GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Libel and Slander. Constitutional Law,* Freedom of speech and press, Libel and slander. *Malice. Words,* "Public official."

Discussion of cases and treatises leading to a consensus that all elected officials are "public officials" for the purpose of the application of defamation law. [479-483]

This court concluded that persons who serve in elective public office, including that of town meeting representative, are "public officials" for purposes of defamation law, that the newspaper article alleged to be defamatory in this case related to the public official's position as a town meeting representative, and that, based on the summary judgment record, the town meeting representative failed to sustain his burden of proving, by convincing clarity, that the newspaper article alleged to be defamatory was false or that those who published the article did so with reckless disregard for its truth or falsity. [483-485]

CIVIL ACTION commenced in the Superior Court Department on October 2, 1996.

The case was heard by *Patrick F. Brady,* J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Frederick C. Grosser (Richard M. Bennett* with him) for the plaintiff.

*James C. Heigham (Sarah Chapin Columbia* with him) for the defendants.

CORDY, J. In this case we hold that persons who serve in elective public office, including that of town meeting representative, are "public officials" for purposes of our defamation law.

[1]Nan Anastasia, Phyllis Hughes, Charles Mathewson, and Mark Pothier. Several of the documents in this case refer to Mathewson as "Matherson," but for consistency we will use the spelling that appears in the byline of the article.

1. *Background.* The town of Plymouth (town) is governed by a board of selectmen (board) and a representative town meeting. According to the town charter, town meeting representatives "shall exercise all legislative powers of the town." There are 104 elected town meeting representatives, eight each from thirteen precincts.[2] They meet once a year to approve bylaws, budgets, and bond issues proposed by the board. Any Plymouth resident or taxpayer may speak at town meeting, but only the elected town meeting representatives may vote on the articles in the town meeting warrant. Town meeting representatives are not compensated for their service or their expenses. They are required to obtain only ten signatures to appear on the ballot, run in nonpartisan elections, and do not report their campaign finances to the office of campaign and political finance. If elected, they serve three-year terms.

The plaintiff, Eugene T. Lane, Jr., is a Plymouth town meeting representative. He does not campaign, raise funds, or publish position papers. In the 1994 election, Lane was elected on the receipt of 345 votes, representing less than one per cent of the total population of the town. Lane is also a Plymouth fire fighter and the son of the chairman of the board. With his brother, he operates a hydroseeding and landscaping business.

The defendant MPG Newspapers is the publisher of The Old Colony Memorial, a weekly newspaper. It employs the defendants Nan Anastasia, Phyllis Hughes, Charles Mathewson, and Mark Pothier.

On July 20, 1995, The Old Colony Memorial published a story that on July 9, 1995, Lane stole water from a town fire hydrant to fill the 500-gallon tank of his hydroseeding truck. The story, entitled "Firefighter Steals Hydrant Water" and subtitled "Selectman's Son Calls Newspaper Story Slander," mentioned in its first paragraph that Lane was a town meeting representative. As the subtitle of the article suggests, Mathewson, the author of the article, conducted an interview with Lane, who denied that he had been in the vicinity of the hydrant that day. After being contacted by Mathewson, however, Lane ap-

---

[2]The population of the town, according to the 1990 census, was 48,329. Consequently, each of the thirteen precincts consists of approximately 3,717 residents.

plied to the town water superintendent for and received a permit to take water from town hydrants. The newspaper delayed publication of the article until July 20 to allow Mathewson an additional week to conduct further fact checking.

Lane filed suit against the defendants in the Superior Court alleging libel and infliction of emotional distress.[3] The parties filed cross motions for summary judgment. The motion judge ruled that Lane was neither a public official nor a public figure[4] by virtue of his job as a fire fighter or his familial relationship to the chairman of the board. The judge also held that the record before him was insufficient to decide whether Lane's status as a town meeting representative made him a public official. Two years later the defendants again moved for summary judgment. On April 10, 2000, the motion judge, applying the criteria set forth in *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849 (1979), ruled that Lane, as a town meeting representative, was a public official. In addition, he found that Lane had no reasonable expectation of proving that the defendants published the article with actual malice, as required by *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280 (1964), and therefore granted summary judgment for the defendants on both the libel claim and the infliction of emotional distress claim.[5] Lane appealed, and we transferred the case to this court on our own motion. Before us are two issues: (1) whether Lane is a public official, as that term is used in defamation law, due to his position as a town meeting representative; and (2) whether the motion judge properly granted summary judgment for the defendants.

---

[3]Eugene T. Lane, Jr.'s (Lane), wife's count for infliction of emotional harm was dismissed. That dismissal is not challenged on appeal.

[4]Public figures are persons who, while not public officials, occupy a sufficiently prominent place in public affairs to be held to the same requirements as public officials in actions for defamation. See *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 332-337 (1974).

[5]The judge ruled that Lane could not prove intentional infliction of emotional distress because that tort also required actual malice, see *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988), and could not prove negligent infliction of emotional distress because that claim required some objective evidence of physical harm, see *Sullivan* v. *Boston Gas Co.*, 414 Mass. 129, 137-138 (1993), which had not been shown. Lane does not challenge these rulings on appeal.

2. *Discussion.* (a) In the absence of disputed material facts, the question whether a person is a public official is one of law, which we review de novo. See *Stone* v. *Essex County Newspapers, Inc., supra* at 862-863.

In *New York Times Co.* v. *Sullivan, supra,* the United States Supreme Court held that the protections afforded speech in the First Amendment to the United States Constitution require a public official to prove actual malice[6] to sustain a claim for defamation based on criticism relating to his official conduct. *Id.* at 279-280. The Court's decision rested on a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *id.* at 270, and on an understanding "[t]hat erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.' " *Id.* at 271-272, quoting *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 433 (1963).

The public official in the *New York Times* case was an elected commissioner of the city of Montgomery, Alabama, and there was no need for the Court to decide whether everyone holding a public position, elected or appointed, was a "public official" for defamation purposes. Consequently, it noted that it was not establishing a test to determine "how far down into the lower ranks" public official status extended. *Id.* at 283 n.23. Since the decision in *New York Times Co.* v. *Sullivan, supra,* there has been decisional law both in State and Federal courts regarding whether certain public employees are "public officials" for defamation purposes. See, e.g., *Rosenblatt* v. *Baer,* 383 U.S. 75, 85-86 (1966) (stating that public official status "at the very least" applies to appointed government employees who have substantial responsibility for or control over conduct of government affairs); *Rotkiewicz* v. *Sadowsky,* 431 Mass. 748 (2000); *Coughlin* v. *Westinghouse Broadcasting & Cable Inc.,* 603 F. Supp. 377, 387 (E.D. Pa.), aff'd, 780 F.2d 340 (3d Cir. 1985) (holding police officer to be public official); *Nodar* v. *Galbreath,* 462 So. 2d 803, 808 (Fla. 1984) (holding public high

---

[6]Actual malice in this context means either knowledge that a statement made about the official is false or reckless disregard for whether it is false or not. See *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 280 (1964).

school teacher not to be public official); *Johnston* v. *Corinthian Television Corp.*, 583 P.2d 1101, 1102 (Okla. 1978) (holding public school coach to be public official). In attempting to answer this question, courts have fashioned a variety of "tests" focusing on an employee's responsibilities and status. For example, in *Rotkiewicz* v. *Sadowsky*, *supra*, this court concluded that a police officer was a public official, and enumerated the following factors to be considered in making such a determination:

> " 'The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.' . . . Some of the other relevant considerations . . . are the government employee's ability to set policy guidelines that are of importance to public debate; . . . the impact of the government position on everyday life; the potential for social harm from abuse of the government position; as well as the employee's access to the press" (citations omitted).

*Id.* at 753, quoting *Rosenblatt* v. *Baer*, *supra* at 86-87 n.13.[7]

Notably, none of the defamation cases decided by the United States Supreme Court since *New York Times Co.* v. *Sullivan*, *supra*, on the question "how far down into the lower ranks" a public employee must be to escape the public official label, has involved an elected official. See, e.g., *Masson* v. *New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) (nonelected professor and psychoanalyst); *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1 (1990) (nonelected high school wrestling coach); *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974) (nonelected prominent at-

---

[7]The motion judge in this case, not having the benefit of our decision in *Rotkiewicz* v. *Sadowsky*, 431 Mass. 748 (2000), followed this court's previous guidance in *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849 (1975). There we relied on the United States Supreme Court's decision in *Rosenblatt* v. *Baer*, 383 U.S. 75 (1966), for the proposition that public officials are officials who "have, or publicly appear to have, substantial responsibility for control of public affairs," and that a public official's position "must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Stone* v. *Essex County Newspapers, Inc.*, *supra* at 863, 864, quoting *Rosenblatt* v. *Baer*, *supra* at 86-87 n.13.

torney); *Curtis Publ. Co.* v. *Butts*, 388 U.S. 130 (1967) (nonelected public university athletic director); *Rosenblatt* v. *Baer, supra* (nonelected county recreation area supervisor).[8] Similarly, defamation cases decided by our appellate courts have dealt exclusively with the status of appointed public employees. See, e.g., *Rotkiewicz* v. *Sadowsky, supra* (police officer); *Stone* v. *Essex County Newspapers, Inc., supra* (nonelected local redevelopment authority member); *Netherwood* v. *American Fed'n of State, County & Mun. Employees, Local 1725*, 53 Mass. App. Ct. 11 (2001) (nonelected regional school district director of maintenance and transportation).

When they have addressed the status of elected officials, cases decided in Federal jurisdictions are uniform in either deciding or assuming that elected officials are public officials for defamation purposes. See, e.g., *Garcia* v. *Board of Educ. of the Socorro Consol. Sch. Dist.*, 777 F.2d 1403, 1408 (10th Cir. 1985) (elected school board members); *Fadell* v. *Minneapolis Star & Tribune Co.*, 557 F.2d 107, 108 (7th Cir. 1977) (elected township tax assessor); *Dostert* v. *Washington Post Co.*, 531 F. Supp. 165, 166 n.1 (N.D. W. Va. 1982) (elected judge). State courts have been similarly consistent. See *Nodar* v. *Galbreath, supra* at 808 n.3 (distinguishing nonelected public school teacher from elected superintendent); *Flannery* v. *Allyn*, 75 Ill. App. 2d 365, 373 (1966) ("little doubt that a Commissioner of Police, who was an elected official, is a public official"); *Beeching* v. *Levee*, 764 N.E.2d 669, 679 (Ind. Ct. App. 2002) ("elected school board members could easily be determined to be 'public officials' because of their elective office"); *Sassone* v. *Elder*, 601 So. 2d 792, 797 (La. Ct. App. 1992) (*New York Times* rule applies to "elected public officials"); *A.S. Abell Co.* v. *Barnes*, 258 Md. 56, 75 (Ct. App. 1970) (plaintiff not public official in part because "[s]he held no elective office . . ."); *Silsdorf* v. *Levine*, 59 N.Y.2d 8, 17 (1983) ("Plaintiff [mayor and participant in election for office] clearly . . . a 'public of-

---

[8]The United States Supreme Court has held the *New York Times* standard to apply to candidates for public office. See *Ocala Star-Banner Co.* v. *Damron*, 401 U.S. 295, 299 (1971) (candidate for county tax assessor); *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265 (1971) (candidate for United States Senate). Those opinions do not, however, discuss "how far down into the lower ranks" the respective offices were.

ficial' "); *Johnston* v. *Corinthian Television Corp.*, *supra* at 1102 ("person may become a public official within contemplation of the New York Times rule . . . [by being] an elected official"); *Braig* v. *Field Communications*, 310 Pa. Super. 569, 577 (1983) ("appellant concedes he is certainly an elected 'public official' "); *Grayson* v. *Curtis Publ. Co.*, 72 Wash. 2d 999, 1006 (1967) (considering whether *New York Times* rule applies to cases "other than those involving elected public officials"); *Long* v. *Egnor*, 176 W. Va. 628, 636 (1986) ("no question that [elected] Board [of Education] members must be treated as public officials, as that term is used in libel law"); *Lewis* v. *Coursolle Broadcasting of Wis., Inc.*, 127 Wis. 2d 105, 115 (1985) (former State assemblyman not public official since resignation from elected office). Lane has not directed our attention to any State or Federal court ruling that an elected official is not a public official, and we have found none.

Leading defamation treatises also conclude that a rule that considers all elected officials to be public officials for defamation law purposes is appropriate. In B.W. Sanford, Libel and Privacy § 7.2.3.1 (2d ed. 1991 & Supp. 1993), the author states:

> "Some positions seem immutably appropriate for 'public official' status. Elected officials must satisfy the *Sullivan* standard. An elected member of a legislative body, or an individual holding the office of mayor, for instance, clearly should be held a 'public official.' Indeed, it is doubtful that *any* elected governmental position is so 'far down into the lower ranks' that it is inappropriate for application of the [*New York Times Co.* v.] *Sullivan* rule" (emphasis in original).

*Id.* Similarly, R.D. Sack concludes that "[a]ll elected officials are 'public'; by running for office they place their character and behavior before the public for consideration." 1 R.D. Sack, Libel, Slander and Related Problems § 5.2.1, at 5-6 (3d ed. 1994 & Supp. 2002). See R.H. Phelps & E.D. Hamilton, Libel: Rights, Risks, Responsibilities 175 (rev. ed. 1978) ("[Misstatements are protected] on all three levels — national, state and local. All elected officials are covered, from the President on down").

In summary, there is a consensus that all elected officials are

public officials for the purpose of the application of defamation law. Despite this consensus, Lane's argument is, in essence, that as one of 104 town meeting representatives who convene only once a year to vote on policies and budgets developed by the board of selectmen, his position is so insignificant that it ought to qualify as an exception to the rule. He points out by analogy that the office of campaign and political finance does not even require town meeting representatives to report their campaign finances.[9]

While we agree that the limited responsibilities of an elected town meeting representative may place that position at the far end of a continuum of elected public officials from that of the President of the United States, the principle of "uninhibited, robust, and wide-open" public debate regarding the conduct of those we elect to govern applies equally to both. *New York Times Co.* v. *Sullivan, supra* at 270. See, e.g., *Mills* v. *Alabama,* 384 U.S. 214, 219 (1966) ("press serves and was designed to serve . . . as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve"); *Medico* v. *Time, Inc.,* 643 F.2d 134, 141 (3d Cir. 1981) ("Elected officials derive their authority from, and are answerable to, the public . . . . [T]here can be no penalty for exposing to general view the possible wrongdoing of government officials"); *Ellerbee* v. *Mills,* 262 Ga. 516, 517 (1992) ("people should be free to question and criticize those who govern them"). As Justice Black stated in *New York Times Co.* v. *Sullivan, supra,* "This Nation of ours elects many of its important officials; so do the States, the municipalities, the counties, and even many precincts. These officials are responsible to the people for the way they perform their duties." *Id.* at 296 (Black, J., concurring).[10]

By making the office of town meeting representative elective,

---

[9]Definitions adopted by the office of campaign and political finance are not dispositive of the issue before us. See *Rosenblatt* v. *Baer, supra* at 84 ("States have developed definitions of 'public official' for local administrative purposes, not the purposes of a national constitutional protection. If existing state-law standards reflect the purposes of *New York Times,* this is at best accidental").

[10]See *New York Times Co.* v. *Sullivan, supra* at 297 n.5 (Black, J., concurring), quoting Tucker, Blackstone's Commentaries 297 (1803) ("For a representative democracy ceases to exist the moment that the public

the town has invited public scrutiny of the qualifications of candidates for that office as well as their performance. Consequently, we hold that Lane is a public official, and we perceive no circumstances in which any elected official holding public office would be considered otherwise.

The rule that we announce today does not affect the requirement that, to be protected, a defendant's speech must relate to a public official's official conduct or qualifications for office. This requirement has been clearly established by the Supreme Court. See *Ocala Star-Banner Co.* v. *Damron*, 401 U.S. 295, 299 (1971); *New York Times Co.* v. *Sullivan, supra* at 259, 283 & n.23. In this case, we have no trouble concluding that the article alleging Lane's theft of town water related to his position as a town meeting representative. That position was mentioned twice in the article, including in the first paragraph, and the subject of the article was Lane's use of town property. Moreover, a "charge of criminal conduct against an official or a candidate . . . is always relevant to his fitness for office for purposes of applying the *New York Times* rule of knowing falsehood or reckless disregard of the truth." *Stone* v. *Essex County Newspapers, Inc., supra* at 863, quoting *Ocala Star-Banner Co.* v. *Damron, supra.*

(b) Based on the summary judgment record before him, the motion judge concluded that Lane could not reasonably expect to prove that the defendants acted with actual malice, and therefore that summary judgment was appropriate. Lane appeals from this ruling.[11] We will affirm an order granting summary judgment to the defendants if they have demonstrated that the plaintiff "has no reasonable expectation of proving an essential element of the case at trial." *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 127 (1997).

---

functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it").

[11]The defendants argue that Lane waived this claim by not responding to the defendants' argument (in their second motion for summary judgment) that he could not prove actual malice. Unfortunately, the record of the proceedings below and the motions and memoranda submitted has not come to us in complete form. Out of caution, we will therefore address the point on the merits.

Given Lane's status as a public official, he would have to prove, by "convincing clarity," that the defendants published the allegation of water theft knowing that the allegation was false or recklessly disregarding whether it was false. *New York Times Co.* v. *Sullivan, supra* at 285-286. The judge concluded that Lane could not sustain this burden. We agree. First, there is no evidence that any of the defendants knew the article to be false. Second, there is no evidence that the defendants acted with "reckless disregard" for the truth or falsity of the article. In *St. Amant* v. *Thompson,* 390 U.S. 727, 731 (1968), the Supreme Court held that in order to establish reckless disregard in these circumstances the plaintiff must show "that the defendant in fact entertained serious doubts as to the truth of his publication," but proceeded to publish anyway. The record does not reveal any realistic way in which Lane could show that the defendants entertained serious doubts about the truth of the publication.[12] The only evidence even possibly supporting such a conclusion is that the publication of the article was delayed by one week for fact checking. But the affidavit of Mathewson, the writer of the article, and the interrogatory answers of the managing editor of The Old Colony Memorial make clear that the extra week was used by the defendants only to solidify the story; the defendants themselves did not doubt its accuracy. Summary judgment was properly granted.

3. *Conclusion.* The order of the Superior Court judge granting summary judgment for the defendants is affirmed.

*So ordered.*

---

[12]There is, in fact, nothing in the record to suggest that the defendants should have entertained any doubts about the veracity of the story. The story was based on two eyewitness accounts of Lane's use of the town hydrant as well as two interviews with Lane, the statement of the town water superintendent that Lane did not have a permit to use the hydrant and a review of Lane's home water usage records that suggested that he had not obtained the water at home. In these circumstances, the defendants could reasonably have expected the story to be correct.